UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANGELA HAGIGEORGES,           )
                              )
             Plaintiff,       )    CIVIL ACTION NO.
                              )    11-11842-DPW
v.                            )
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social        )
Security,                     )
                              )
             Defendant.       )
                              )

MEMORANDUM AND ORDER
October 25, 2012

Angela Hagigeorges appeals the final decision of the

Commissioner of the Social Security Administration (the

"Commissioner"), denying her Social Security Disability Insurance

benefits ("SSDI") and Supplemental Security Income benefits

("SSI").  The Commissioner has moved for an order affirming his

decision, and Hagigeorges has moved for an order reversing the

Commissioner's decision.  After consideration of the entire

record, I remand the decision to the Commissioner for further

proceedings.

**I.   BACKGROUND**

A.   Basic Facts

Hagigeorges was 49 as of May 1, 2005, the date of the

alleged onset of her disability, and is currently fifty-six years

old.  She has a college education, and received a degree in

graphic art from the Massachusetts College of Art in 1977.  AR

35.   She did not receive any training or education in the use of computer graphic design programs, and has only minimal computer training.  AR 67.

Until 2004, Hagigeorges worked as a freelance graphic artist for advertising agencies.  AR 36.  In that job, she frequently pasted materials together using spray-on glue to assemble ad layouts.  She also worked with rubber cement and markers.  AR 38, 480.

B.   Medical History

In July and August 2005, Hagigeorges saw her primary care physician, Dr. William Zinn, and complained of shortness of breath and a persistent cough and wheeze.  AR 295-96.  On August 23, 2005, Hagigeorges underwent a stress test on a treadmill.  AR 293.  She was found to have an exercise tolerance 70% below normal for a sedentary 49 year old woman.  The test was stopped after eleven and a half minutes because she was coughing and experiencing shortness of breath, but the testing physician found no arrhythmias and Hagigeorges' blood pressure response was normal.  Her peak heartrate was 85% of the expected rate for her age and gender.  AR 293.

On August 23, 2005, Hagigeorges also performed a pulmonary function study which revealed that she had a forced vital capacity ("FVC") of 55% of the predicted amount, and a forced expiratory volume in 1 second ("FEV1") of 38% of the predicted

amount.  The doctor performing the study, Dr. Maheshwari, suggested that the results indicated a restriction or obstruction in Hagigeorges' oxygen supply.  AR 284.  On August 31, 2005, Hagigeorges had a chest x-ray which showed extensive bibasilar infiltrates.  AR 284.  A CT scan taken on September 2, 2005, showed some bronchiectasis and multiple patchy infiltrates in the lower portions of both lungs.  AR 288.

Dr. Zinn referred Hagigeorges to Dr. Jonathan Strongin for a consultation on September 14, 2005.  AR 283-85.  At her consultation, Hagigeorges noted that her shortness of breath began when she moved into an apartment in Rockport earlier that year.  She reported that her breathing had gotten better after a recent visit to a chiropractor, but that she was constantly tired and sleeps poorly.

Dr. Strongin observed Hagigeorges in his office and looked at her pulmonary function study, chest x-ray, and CT scan, and thought that Hagigeorges had two problems.  First, Dr. Strongin hypothesized that Hagigeorges's abnormal chest x-ray, shortness of breath, and restrictions on pulmonary function testing indicated hypersensitivity pneumonitis from her change in living conditions, or scarring from a pneumonia that she had two years prior.  Second, Dr. Strongin thought that Hagigeorges might have obstructive sleep apnea.  As to the first problem, Dr. Strongin suggested a regimen of corticosteroids to see if a CT scan and

pulmonary function study would show improvement in her condition. AR 284.  As to the possible sleep apnea, Dr. Strongin suggested that Hagigeorges consider a polysomnographic evaluation.  AR 285.

On October 18, 2005, Hagigeorges went to Dr. Strongin for a follow-up pulmonary function test.  AR 278.  She had a FEV1 of 84% and a FVC of 79%.  Dr. Strongin noted that compared to her tests in August 2005, Hagigeorges's restrictions had improved. Indeed, Dr. Strongin thought that Hagigeorges's lung volumes were normal, and their diffusion capacity was within the normal range as well.  AR 278.  At a follow up appointment on October 26, 2005, Hagigeorges reported to Dr. Strongin that she was feeling much better on the Prednisone that had been prescribed for her, and was less winded, was coughing much less, and generally felt "quite well."  AR 280.  Dr. Strongin thought that Hagigeorges had interstitial lung disease, but that the Prednisone had brought her pulmonary function study results to "essentially normal" levels.  AR 280.  He also noted that a CT scan from earlier in October showed marked improvement in the interstitial opacities in her lungs after beginning Prednisone.  AR 280.

Hagigeorges returned to see Dr. Strongin on March 29, 2006. AR 320.  Dr. Strongin reported that Hagigeorges was doing "much better" than when he first saw her, and that her breathing was better.  AR 320.  Dr. Strongin noted that Hagigeorges had developed a so-called buffalo hump, a supraclavicular fat pad

associated with Prednisone, but advised her that the hump would go away over a period of time after she tapered off of Prednisone.  Hagigeorges still had some shortness of breath with exertion, but generally her condition had responded to the course of Prednisone.  Dr. Strongin recommended that Hagigeorges continue to taper off the Prednisone to the point where she could stop taking it.  *Id.*

Hagigeorges saw Dr. Strongin again on June 21, 2006.  AR 274.  She reported to Dr. Strongin that within four days of tapering off of the Prednisone in April, her shortness of breath returned when she walked up the three flights of stairs in her apartment building.  *Id.*  She did not wheeze any more, but experienced an occasional cough still.  *Id*.  Dr. Strongin thought that although it was possible her allergic alveolitis had returned, it was also possible that Hagigeorges was just overweight and out of shape, which would explain why she was out of breath after climbing three flights of stairs carrying groceries.  *Id.*  Dr. Strongin recommended that Hagigeorges have another CT scan and pulmonary function study taken, and if a decrease was shown in either then a lung biopsy might be in order.  AR 275.

On July 11, 2006, Hagigeorges had another CT scan which revealed patchy groundglass infiltrates at the bases of each of her lungs that were worse than prior CT scans had revealed.  AR

273.  Bronchiectasis was also noted, predominantly in the lower lobes of her lungs.  *Id.*  On July 13, 2006, she also had a pulmonary function study which showed that her FVC was 60%, FEV1 was 64%, and total lung capacity was 75% of what was predicted for her age and gender.  After 6 minutes of exercise, Hagigeorges's air saturation dropped to 87%.  The impression this gave was that Hagigeorges had mild restrictive disease with a mild reduction in the diffusion capacity (which had been measured at 13, or 63% of what was predicted).  In comparison to the October 2005 test, Hagigeorges's total lung capacity had decreased 10% and her diffusion capacity decreased approximately 18%.

Dr. Strongin reviewed Hagigeorges's tests on July 19, 2006 and maintained his suspicion that she had an allergic alveolitis, but recognized that the test results could signify a number of things including sarcoid, tuberculosis, bronchiolitis obliterans, and organizing pneumonia, among others.  AR 268.  He prescribed oxygen for Hagigeorges to use with exertion, and recommended that she get a lung biopsy by Dr. Peter Maggs, a thoracic surgeon.

Dr. Maggs performed the lung biopsy on August 11, 2006, and found that Hagigeorges had interstitial lung disease.  AR 255.  The biopsy showed a diffuse pattern of interstitial chronic inflamation with scattered lymphoid follicles.  AR 263.

On August 31, 2006, Dr. Zinn saw Hagigeorges and reported that she experienced shortness of breath or dyspnea after walking one block.  AR 236.

On September 13, 2006, Dr. Strongin saw Hagigeorges for a follow up visit.  AR 252.  During that visit, Hagigeorges reported feeling well and that she was only using the prescribed oxygen intermittently.  Dr. Strongin talked about the biopsy results with Hagigeorges and discussed a plan of treatment.  *Id.* Dr. Strongin recommended that Hagigeorges get a second opinion before proceeding with any treatment plan, and suggested she see a rheumatologist, Dr. Romain.

The following day, Dr. John Jao, a state-agency reviewing physician, looked at Hagigeorges's records and thought that she could: occasionally lift or carry ten pounds; frequently lift or carry two to three pounds; stand two hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally climb a ramp or stairs, but never a ladder, rope, or scaffold; and frequently balance, stoop, kneel, crouch, or crawl.  AR 227-28.  Dr. Jao opined that Hagigeorges should avoid concentrated exposure to extreme cold or heat and environmental hazards, and moderate exposure to fumes, odors, dusts, gases or areas of poor ventilation.  AR 230.  He also noted that Hagigeorges would be limited to working in an environment that allowed her to use her supplemental oxygen.  AR 227-28.

On October 3, 2006, Hagigeorges saw Dr. Tatiana Romero, a rheumatologist, for a consultation. AR 246-47. Dr. Romero reported that Hagigeorges's only limitation due "to her lung condition is her dyspnea on exertion which makes her walk a bit slower than she used to in the past." AR 247. Dr. Romero recommended that steroid sparing drugs as a better approach to treating her compared to high dose steroids alone. AR 247.

Three days later, Hagigeorges had another pulmonary function study. AR 244-45. Her FEV1 was 75% of the predicted level, and her FVC was 65%. AR 244. Her total lung capacity was 3.99 litres, or 73% of the predicted level, and her diffusion capacity was 15.76, or 76% of the predicted level. *Id.* This represented a 13% increase in her diffusion capacity since the July 11, 2006 study. AR 244-45. Hagigeorges's room air saturation at rest and with exercise was greater than 97%, and she was able to walk a total of 600 feet without shortness of breath. AR 244. A CT scan on October 16, 2006 showed slight improvement in the ground glass opacities at the base of her lungs. AR 240.

The following medical history, other than the retrospective RFCs, post-dates Hagigeorges's date of last insured, but is recited here for the insight it provides concerning her prior condition. On January 29, 2007, Hagigeorges began seeing Dr. Richard Kradin, complaining of increased dyspnea after only 20 steps since going off Prednisone in April 2006. AR 373. Upon

examination, bibasilar crackles were discovered in Hagigeorges's lungs.  Dr. Kradin recognized that her most recent pulmonary function studies and CT scans showed evidence that Hagigeorges's condition was improving, but nevertheless prescribed Prednisone again.  *Id.*  Dr. Kradin thought that Hagigeorges might have a steroid responsive lesion and he was concerned about a hypersensitivity reaction.  *Id.*

The following day, Dr. Richard Goulding, a state-agency reviewing physician, prepared a residual functional capacity ("RFC") assessment.  He looked at Hagigeorges's records and thought that through December 31, 2006 (the last day she was insured), she could occasionally lift or carry twenty pounds; frequently lift ten pounds; stand or walk between three and four hours in an eight-hour workday; and sit about six hours in an eight-hour workday.  AR 299.  Dr. Goulding thought that Hagigeorges could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and could frequently balance, stoop, kneel, crouch, and crawl.  AR 300.  He also opined that she should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and areas with poor ventilation.  AR 302.

On March 26, 2007, Hagigeorges saw Dr. Kradin and complained that she was short of breath during exercise.  However, he noted that Hagigeorges claimed to be feeling better than she had at her last visit.  AR 372.  Dr. Kradin performed a pulmonary function

study on Hagigeorges and found that her FEV1, FVC, and diffusion capacity were all normal or within normal limits.  AR 371.  A May 23, 2007 study showed the same results, AR 368, though a CT scan continued to show bilateral ground glass opacities in her lungs, AR 365.  By June 25, 2007, Dr. Kradin felt that Hagigeorges's breathing was "basically stable" and began to taper her off of Prednisone.  AR 364.  He also recommended she undergo a sleep study, because she had complained of snoring and daytime somnolence.  *Id.*

The following night, a polysomnography study was performed to test for sleep apnea.  AR 307.  The study found that Hagigeorges's sleep efficiency was severely reduced to 77%, and that over 429 minutes, Hagigeorges was aroused 93 times, principally as a result of respiratory events.  *Id.*  The study concluded that Hagigeorges had moderate obstructive sleep apnea, sleep fragmentation, and desaturation.

On August 8, 2007, Hagigeorges had another pulmonary function study after she had tapered down to 5mg of Prednisone.  Her FEV1 was 78% of the predicted level, her FVC was 79%, and her diffusion capacity was normal.  AR 360.  The study showed that Hagigeorges had a mild restrictive ventilatory deficit, but noted that her FEV1 and FVC were essentially unchanged from the May 2007 pulmonary function study when she was on a higher dose of Prednisone.  *Id.*

Two months later, on October 15, 2007, Hagigeorges had
another pulmonary function study showing a FEV1 of 76%, a FVC of
76%, and a normal diffusion capacity.  AR 357.  She also had a CT
scan taken, which revealed patchy ground glass opacities in the
base of each lung.  AR 355.

On January 16, 2008, Dr. Kradin filled out a Medical Source
Statement of Hagigeorges's ability to do work-related activities.
AR 375-81.  He thought that she could lift and carry up to ten
pounds frequently, and up to twenty pounds occasionally.  AR 375.
He also thought that she could sit for eight hours, stand for two
hours (one hour at a time), and walk for one hour (fifteen to
twenty minutes at a time) out of an eight hour work day.  AR 376.
He thought she could occasionally climb stairs and ramps,
balance, stoop, kneel, crouch, and crawl.  AR 378.  Dr. Kradin
opined that Hagigeorges could occasionally be exposed to
unprotected heights, moving mechanical parts, humidity and
wetness, and vibrations; could occasionally operate a motor
vehicle; but could never be exposed to dust, odors, fumes,
pulmonary irritants, extreme cold, or extreme heat.  AR 379.[1]

On February 11, 2008, Hagigeorges had another pulmonary
function study.  AR 383.  Her FEV1 was 73% of predicted levels,
her FCV was 74% of predicted levels, and her diffusion capacity

---

[1]  His views, however, were based on how Hagigeorges was in 2008,
not during the relevant time period at issue here.

was normal.  AR 383.  At the time, Hagigeorges complained of
increased cough and dyspnea since stopping Prednisone, so Dr.
Kradin suggested she start taking it again.  AR 382.

On September 14, 2009, Hagigeorges had a pulmonary function
study which showed that her FEV1 and FVC were "approaching the
lower limits of normal" and that her diffusion capacity remained
normal.  AR 650.  Dr. Robert Brown, who performed the study,
found that the data from the September 2009 test was similar to
the six prior tests dating back to March 2007.  *Id.*  By December
2009, Hagigeorges's FEV1, FVC and diffusion capacity were all
considered normal or within normal limits.  AR 651.  Similar
conclusions were drawn after a May 18, 2010 pulmonary function
study as well.  AR 653.  In September 2010, a CT scan showed
improvement in the ground glass opacities in Hagigeorges's lungs,
consistent with improvement of her non-specific interstitial
pneumonia, AR 654, so Dr. Kradin suggested tapering her off of
Prednisone.  AR 609.  After tapering, a pulmonary function study
performed on February 22, 2011 showed that Hagigeorges's FEV1 was
79% and FVC was 78% of the predicted levels, but her diffusion
capacity was reduced.  AR 660-61.

That same day, Dr. Zinn referred Hagigeorges to Dr. Fiona
Gibbons for her lung disease.  AR 659.  Hagigeorges reported
feeling well on 10mg of Prednisone, but that when she tapered
down to 5mg, her cough and dyspnea returned.  *Id.*  When she was

12

on 10mg of Prednisone, Hagigeorges could walk up three flights of
stairs with less difficulty than she could on 5mg; at the lower
dosage, she would have to stop a few times before getting to the
top.  *Id.*  Dr. Gibbons thought that Hagigeorges's record
demonstrated that she was steroid dependent, had a steroid
myopathy, and experienced some steroid withdrawal symptoms.  AR
661.  She also thought that Hagigeorges may have secondary
adrenal insufficiency.  *Id.*

A March 2, 2011 CT scan showed that Hagigeorges's ground
glass opacities had increased since the September 2010 CT scan
and were similar to the October 2007 CT scan results.  AR 664.
She was also prescribed a CPAP mask in March to help alleviate
her sleep apnea.  AR 676.  In April, Hagigeorges reported that
the CPAP mask reduced her headaches in the morning.  AR 684.

On May 9, 2011, Dr. Gibbons completed a residual functional
capacity assessment for the time period between May 1, 2005 (the
alleged onset date of Hagigeorges's disability) and December 31,
2006 (her last date of insurance).[2]  AR 692-93.  Dr. Gibbons
thought, based on Dr. Jao's September 14, 2006 assessment, that
Hagigeorges could stand about two hours and sit at least six
hours in an eight-hour workday; frequently lift and carry less

---

[2]  Dr. Gibbons had previously completed an RFC for Hagigeorges,
AR 678-79, but that assessment was done based on Hagigeorges's
first appointment in February 2011, and was not limited to the
relevant time period as Dr. Gibbons's second RFC was.  *Compare* AR
678, *with* AR 692.

than ten pounds and occasionally lift and carry ten pounds.  AR

692-93.  Dr. Gibbons opined that Hagigeorges should avoid

exposure to concentrated cold or heat, and moderate fumes, odors,

dust, and gases.  AR 693.  Dr. Gibbons also noted that

Hagigeorges would need unscheduled breaks during the workday.  AR

693.  In her RFC, Dr. Gibbons listed the only side effect of

Prednisone that Hagigeorges experienced from September 2005 until

April 2006 was weight gain.  AR 692.

C.   Procedural History

     1.   *Application for SSDI and SSI*

     Hagigeorges filed her claims for SSI and SSDI in July 2006.

She claimed that she became disabled on May 1, 2005 due to lung

disease, hypersensitivity pneumonitis, and pulmonary alveolus.

At the time she allegedly became disabled, she was insured.[3]

While her claim was being processed, she was diagnosed with

obstructive sleep apnea and developed side effects from the drugs

she was taking for the lung disease.

     The Commissioner initially denied her claim on September 18,

2006.  Hagigeorges asked the Commissioner to reconsider, and the

_____

[3]  To be eligible for SSDI, Hagigeorges must show that she was
insured for disability at the time she became disabled.  Under
the regulations, she must show that she was fully insured and had
"at least 20 [quarters of coverage] in the 40-quarter period"
leading up to the quarter in which he became disabled.  20 C.F.R.
§ 404.130(b).

Commissioner again denied her claim on February 7, 2007.  On
March 8, 2007, Hagigeorges filed a request for a hearing.

>    2.   *The ALJ's First Hearing*

On January 8, 2008, the ALJ held a hearing at which
Hagigeorges and a vocational expert testified.  AR 27-73.

>         i.   Hagigeorges

Hagigeorges testified that until 2004 she was working as a
freelance graphic artist for a number of advertising agencies.
She claimed disability as of May 1, 2005, however, because it was
not until then that she found she was unable to work due to a
medical condition.  At that time, she found herself having
difficulty breathing, and could walk no more than a few steps at
a time without having to stop and take a break.  As a graphic
artist, Hagigeorges would design and assemble physical graphics
presentations for advertising agencies, cutting paper and
affixing it to presentation boards with aerosol glues.

When the ALJ asked her if she thought she could work at all,
she said that she did not think she could.  When asked why not,
she stated that her breathing disorders limited her in a number
of ways.  For example, she could not get to work if it was too
cold outside, or too hot, because both those conditions would
aggravate her breathing condition.  She said that if she breathed
any kind of pollution or perfumes, she choked, gagged, and
coughed.

She stated that she was taking Prednisone to help her condition, though her interstitial lung disease is irreversible. The problem, however, was that Prednisone caused osteoporosis, and so her doctors would cycle her on and off Prednisone. According to Hagigeorges, before Prednisone she couldn't even walk ten feet at a time.  However, once she started taking Prednisone, she experienced substantial weight gain, reaching a bodyweight of 225 pounds up from 170 pounds.

Hagigeorges told the ALJ that her doctors had recommended that she not physically exert herself due to her condition, and that she not lift things heavier than ten pounds.  Hagigeorges also reported that doctors had warned her not to breathe extreme hot or cold air, and to stay away from toxic substances or other fumes.

The ALJ then noted a number of discrepancies in the medical records and gave Hagigeorges the opportunity to explain them. For example, although Hagigeorges had stated that in 2005 she could only walk ten feet at a time before she had to stop and catch her breath, the ALJ noted that on August 23, 2005, Hagigeorges had a stress test where she walked on a treadmill for eleven and a half minutes, and doctors reported that her physical examination was within normal limits.  Hagigeorges thought she had been coughing and choking and had a very hard time with it, but otherwise could not explain the discrepancy.

16

Hagigeorges testified that, as of the time of the hearing, she could stand for approximately half an hour, sit for three or four hours, and could lift ten pounds.  She stated that she could not be exposed to pulmonary irritants such as perfumes, bleach, smells, smoke, or extreme heat or cold.

When asked to describe her typical day, Hagigeorges stated that she would wake up between seven and seven-thirty in the morning, make coffee and take a shower, run errands such as going to the bank or going grocery shopping, and then would often take a nap in the afternoon due to exhaustion.  In response to the ALJ's questioning, Hagigeorges stated that she occasionally did housework such as the dishes, making the bed, and light-duty cleaning, but not vacuuming or laundry.  She estimated that she did housework for approximately one hour per day, cooked for an hour per day, and went shopping every three to four days although she no longer felt comfortable driving because she was getting dizzy.

Finally, Hagigeorges explained to the ALJ that although the test results in her charts looked normal, they were deceiving because at the time of a number of the tests she was on Prednisone.  When she cycled off Prednisone, she explained, her problems came back and she became disoriented as she went through withdrawal.

ii.  Vocational Expert

The ALJ then posed a hypothetical to the vocational expert ("VE"), Joseph Goodman.  The hypothetical individual was 52 years old with a college education and prior work experience in graphic design, which is sedentary, skilled work.  She had transferrable artistic, clerical, communication, written, and verbal skills. The ALJ told the VE to assume that the hypothetical individual had an RFC of light and sedentary work with the following restrictions: sitting for three to four hours at a time; standing for at least 30 minutes; lifting ten pounds; no exposure to excessive dust or other pulmonary irritants, or work in areas of temperature extremes.

The VE testified that the hypothetical individual would be able to perform her past work, but would also be able to perform other jobs such as information clerk (25,000 jobs available state-wide, and 1,112,000 jobs available nationally), surveillance system monitor (1,080 jobs available state-wide, and 80,000 available nationally), telephone solicitor (5,500 jobs available state-wide, and 385,000 nationally), and bench assembler (2,000 jobs available state-wide, and 288,000 nationally).

In response to Hagigeorges' questioning, the VE responded that his opinion would not change if the hypothetical individual had prior experience as a graphic artist, not a graphic designer.

18

He noted that Hagigeorges had testified to being exposed to irritants in the form of glues and other sprays when assembling posterboards as a graphic artist, but that the Dictionary of Occupational Titles did not note that exposure to irritants was a common environmental working condition factor to be considered with the job of a graphic artist.  If, however, such exposure was a common environmental working condition of a graphic artist, the VE testified that the hypothetical individual with the restrictions listed by the ALJ could not perform her past work as a graphic artist.

The VE also stated that if the hypothetical individual was unable to talk for long periods of time, or frequently had to cough or stop speaking, then that person could not perform the graphic artist, information clerk and telephone solicitor clerk jobs, but could still perform the surveillance system monitor and bench assembler positions.

### 3.  *Further Proceedings*

After the hearing, on February 8, 2008, the ALJ found that Hagigeorges was not disabled.  The Appeals Council declined to review the decision, and Hagigeorges filed a lawsuit in this court.  On February 25, 2010, upon request of the parties, I remanded the case to the ALJ to reconsider and for further administrative proceedings.

19

4.   *The ALJ's Second Hearing*

On April 19, 2011, the ALJ held a second hearing at which Hagigeorges and another vocational expert testified.

i.   Hagigeorges

Hagigeorges noted that her training as a graphic artist did not include any computer-based training.  Having no training in computer-based graphics design, Hagigeorges did all of her work by hand, using rubber cement, paints, glues, and markers to make her presentation boards.  In that job, she often had to carry large boxes of presentation boards and reach to use paper cutters.

She stated that since the last hearing, she had a procedure done to stop some bleeding associated with leiomyomas in her uterus.  Dr. Kradin had also put her back on Prednisone.

Hagigeorges testified that she had experienced a number of side effects from the Prednisone, including calcium buildup which caused kidney and gall stones; osteoporosis; hair loss; bone loss; muscle weakness; and the development of a so-called buffalo hump, a fat pad that develops behind the neck.  She noted that she had experienced the buffalo hump as of 2006, when she was seeing Dr. Strongin, and that its location made it difficult to move her neck.  She also testified that she had experienced Prednisone withdrawal symptoms when she was taken off of it.  She

felt stiffness in her joints, shortness of breath, and chest
pain, and coughed up a lot of mucus.

      ii.  Vocational Expert

The ALJ then posed a hypothetical to vocational expert
Robert Padiwick.  The hypothetical claimant was 51 years old with
four years of college, past relevant sedentary skilled work, and
some of her skills such as her ability to manage her time,
concentrate, and persist, were transferrable.  AR 491.  The
hypothetical individual had an RFC of sedentary and light work.
For the sedentary work, she could sit for the entire eight hours,
could lift five pounds frequently and ten pounds occasionally.
*Id.*  For the light work, she would be able to stand or walk for
fifteen to twenty minutes at a time for up to two hours and sit
with for six hours out of an eight-hour day.  AR 491-92.  She
also "should not be exposed to any excessive pulmonary irritants,
dust, chemical[s], noxious fumes, extremes of heat or
temperature" and could not perform work requiring climbing a
ladder or an excessive amount of stairs.  AR 492.

The VE testified that with those restrictions, the
hypothetical individual could perform her past work as a graphic
artist.  Alternatively, the VE testified that the hypothetical
individual could perform occupations similar to the graphic
artist occupation, including the sedentary jobs of commercial or
industrial designers, floral designers, and interior designers.

The VE estimated that in Massachusetts, between 400 and 800 jobs
exist which are similar to a graphic artist, with 28,000 and
30,000 similar jobs available nationally.

In response to questioning by Hagigeorges' attorney, the VE
admitted that if the hypothetical individual could not be exposed
to any pulmonary irritants, and not just exposed to excessive
irritants as the ALJ's hypothetical had provided, the
hypothetical claimant could not work as a graphic artist or in
the other similar jobs the VE had suggested.  The VE also
admitted that all of the artist and design jobs he had cited
would require some basic computer-based skills, and therefore
someone without any computer skills could not perform them.

   5.   *The ALJ's Decision*

The ALJ issued his written decision on June 21, 2011.  After
finding that Hagigeorges was eligible for SSDI benefits because
she had been insured at the time of the alleged disability, the
ALJ concluded that she was not disabled.  To reach this
conclusion, the ALJ undertook the requisite five-step sequential
analysis.

At step one, the ALJ found that Hagigeorges had not engaged
in substantial gainful activity between May 1, 2005 and her last-
insured date of December 31, 2006.  At step two, the ALJ found
that Hagigeorges suffered from chronic interstitial lung disease,
which he classified as "severe" under the Act because it caused

her more than minimal functional limitations.  At step three, the ALJ found that Hagigeorges did not have an impairment or combination of impairments that met or was equivalent to one of the listed impairments in the regulations.

At step four, the ALJ found that Hagigeorges had the RFC to perform sedentary and modified light work, but with "inability to sit for the entire 6 hours; able to stand/walk for 15-20 minutes for a total of one hour; stand for 2 hours out of an 8-hour day; walk for one hour in an 8-hour day; must avoid work with exposure to excessive dust or pulmonary irritants, including gases, odors, chemicals, dust, fumes, and extreme heat and cold; and must avoid work requiring climbing ladders and excessive stairclimbing."  AR 462.

At step five, the ALJ found that Hagigeorges's RFC limitations would not prevent her from performing her past work as a graphic artist.  The ALJ also found, in the alternative, that there are jobs that exist in significant numbers in the national economy that Hagigeorges could perform.  In making this determination, the ALJ evaluated her age, RFC, education, work experience, and the testimony of the VE.  Because the VE's testimony established that there were a substantial number of jobs in the national economy that Hagigeorges could perform, including her prior work as a graphic artist, the ALJ found that Hagigeorges was not disabled.

## II.   STATUTORY FRAMEWORK

A.   <u>Standard of Review of an ALJ's Decision</u>

The Social Security Act authorizes judicial review of social security disability determinations.  42 U.S.C. § 405(g).  A reviewing court is authorized to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  *Id.*

The factual findings of the Commissioner must be treated as conclusive if "supported by substantial evidence."  *Id.*  Review is "limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence."  *Ward* v. *Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971).  Evidence is not insufficient under this standard merely because contradictory evidence exists in the record.  *Doyle* v. *Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

B.   <u>Standard for Entitlement to SSDI and SSI Benefits</u>

The underlying issue before me is whether Hagigeorges is "disabled" for purposes of the Social Security Act and is therefore eligible for SSDI and SSI benefits.  A "disability" is defined by the Act as an inability "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period" of at least twelve months.  42 U.S.C. § 423(d)(2)(A) (defining disability for SSDI); 42 U.S.C. § 1381c(a)(3)(A) (defining disability for SSI).

An individual may only be considered disabled for purposes of receiving benefits if her impairment is "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) (SSDI); 42 U.S.C. § 1381c (a)(3)(B) (SSI).

Under the relevant regulations, the Commissioner evaluates an individual's claim of disability under a five-step analysis. 20 C.F.R. §§ 404.1520(a), 416.920(a).  If the Commissioner determines that the claimant fails any of the five steps, he can find that the claimant is not disabled under the Act and need not continue the sequential analysis.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

Under the first step, a claimant is not considered disabled if she is engaged in "substantial gainful activity."  *Id.*  Under the second step, if the claimant does "not have a severe medically determinable physical or mental impairment that meets

25

the duration requirement . . . or a combination of impairments that [are] severe and meets the duration requirement" the individual is not considered disabled. *Id.* Under the third step, if a claimant's impairment meets or is equivalent to one specifically listed in the regulations and meets the duration requirement, the individual is deemed disabled. *Id.*

At the fourth step, the claimant's residual functional capacity is determined, and if, given this determination, the claimant is capable of performing her past relevant work, she is not considered disabled. *Id.*

The fifth step considers the claimant's residual functional capacity as well as age, education, and work experience to determine whether the claimant can make an adjustment to other work. If an adjustment can be made, the claimant is not considered disabled. *Id.*

### III.  DISCUSSION

Hagigeorges claims that the Commissioner made three errors in evaluating her claim, and therefore his denial of SSDI and SSI should be reversed or remanded for further consideration. First, she claims that the ALJ erred in finding that her statements were not credible to the extent they were inconsistent with the RFC he found. Second, she contends that the ALJ erroneously ignored the adverse side effects of Prednisone in determining her disability. Finally, she argues that the ALJ erred in determining her RFC by

picking and choosing from the opinions of the physicians in the record.  Each claim will be addressed in turn.

A.   Credibility Determination

The ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  Hagigeorges claims that the ALJ's finding of a lack of credibility to her testimony was inconsistent with the evidence and must be reversed.

Under the regulations, when an ALJ evaluates a claimant's subjective complaints, the ALJ should consider:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).  If an ALJ determines that a claimant's testimony is not credible, the ALJ must support his

decision to discredit her with substantial evidence. *Frustaglia* v. *Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987).

Here, the ALJ detailed the specific objective medical evidence and opinion evidence that he credited and relied on which conflicted with Hagigeorges's statements regarding her symptoms. He recapitulated the medical opinion evidence, and explained why he credited Dr. Kradin and Dr. Gibbons (who, in turn, relied on Dr. Jao's September 14, 2006 assessment of Hagigeorges). The ALJ gave controlling weight to Dr. Kradin's and Dr. Gibbons's reports and opinions because they were treating sources with a longitudinal view of Hagigeorges's record. *See* Soc. Sec. Ruling 96-2p (setting out test for when to give controlling weight to a treating source's opinion).

Hagigeorges's testimony was inconsistent with the evidence in the record. For example, Dr. Jao and Dr. Gibbons found that Hagigeorges was able to stand for 2 hours, sit for at least 6 hours, and could lift and carry up to ten pounds frequently and twenty pounds occasionally. Likewise, Dr. Goulding found that she could stand or walk for three to four hours in an eight-hour workday, sit for about 6 hours, and could lift and carry up to ten pounds frequently and twenty pounds occasionally. He also noted that Hagigeorges could walk 600 feet at a time without complaint or shortness of breath, which was reported in the

October 2006 pulmonary function study results.  The ALJ noted at
the first hearing that on August 23, 2005, Hagigeorges had a
stress test where she walked on a treadmill for eleven and a half
minutes, and doctors reported that her physical examination was
within normal limits.  Hagigeorges, however, testified at that
hearing that she could only stand for approximately half an hour,
sit for three or four hours, and could only walk ten to twenty
feet before she would have to stop, and could not explain the
discrepancy between her testimony and the August 2005 and October
2006 pulmonary function study results.

"The credibility determination by the ALJ, who observed the
claimant, evaluated [her] demeanor, and considered how that
testimony fit in with the rest of the evidence, is entitled to
deference, especially when supported by specific findings.
*Frustaglia*, 829 F.2d at 195.  Although the ALJ cited the opinion
evidence of Dr. Kradin, which was developed during a period not
at issue in this case, when determining that Hagigeorges's
testimony was not credible, the other evidence in the record as a
whole contradicted Hagigeorges's testimony at the hearing.  Thus,
the ALJ properly assessed her credibility in light of the
evidence in the record, and his determination must be upheld.

B.   Side Effects of Prednisone

Next, Hagigeorges argues that the ALJ erred because he did
not specifically consider the side effects of her medication.

The ALJ noted, as Dr. Gibbons had found, that the only side effect of Hagigeorges's Prednisone use was weight gain. Hagigeorges claims, however, that she also had a buffalo hump which made it hard to move her neck at times; a rash from withdrawal; weakness, fatigue, and nasal congestion; and steroid myopathy and secondary adrenal insufficiency.

While the ALJ did not specifically discuss Prednisone's side effects in his written decision, the omission was harmless.  The record is devoid of evidence that any of the listed side effects affected Hagigeorges's functional abilities.  None of her doctors mention any of the listed side effects as presenting functional limitations.  To be sure, some mentioned that Hagigeorges was obese, and Hagigeorges cites regulations recognizing that obesity can sometimes exacerbate existing impairments, Social Security Regulation 02-1p specifically states that the Social Security Administration "will not make assumptions about the . . . functional effects of obesity combined with other impairments."  SSR 02-1p.  But the functional limitations such obesity and other impairments cause must be shown in the record. In the absence of such evidence, an ALJ's failure to address a claimant's obesity is a harmless error.  *Rutherford* v. *Barnhart*, 399 F.3d 546, 553 & n.5 (3d Cir. 2005) (declining to order remand on account of ALJ's failure to consider claimant's obesity when she "never mentioned obesity as a condition that contributed to

her inability to work, even when asked directly by the ALJ to describe her impairments" and no medical evidence indicated obesity contributed to any limitation); *see generally* Charles Alan Wright & Arthur Miller, 33 Fed. Prac. & Proc. Judicial Review § 8337, at 184 (2006) ("Harmless error may be found, however, where correction of the agency's failure will not affect the legitimacy of the outcome.").

C.   Selectively Summarized the Evidence

Finally, Hagigeorges claims that the ALJ selectively summarized the evidence in the record to support his conclusion that she was not disabled.  The First Circuit has made it clear that the question for review is only whether substantial evidence supported the ALJ's decision.  If it did, then it is irrelevant that substantial evidence also could have supported the claimant's view.  *Rodriguez Pagan* v. *Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) ("Although other medical evidence in the record conflicted with Dr. Medina's conclusions, the resolution of such conflicts in the evidence is for the Secretary.  We must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.").

In determining a claimant's RFC, an ALJ is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians."  *Evangelista* v. *Sec'y of Health*

31

& *Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).  A number of
doctors who treated Hagigeorges, as well as state agency
reviewing physicians, found that Hagigeorges had the restrictions
that the ALJ ultimately found.  For example, all of the
physicians who provided RFC analyses for the relevant time period[4]
agreed that Hagigeorges could at least stand for two hours and
sit for six hours out of an eight-hour workday.  *See* AR 227
(Jao), AR 299 (Goulding), AR 376 (Kradin), AR 692-93 (Gibbons).

    Determining the extent to which Hagigeorges could tolerate
pulmonary irritants, however, is more complicated.  Drs. Jao and
Gibbons opined that Hagigeorges should avoid moderate exposure to
fumes, odors, dusts, gases or areas of poor ventilation.  *See* AR
230 (Jao), AR 693 (Gibbons).[5]  Dr. Kradin opined that Hagigeorges
could "never" tolerate such irritants.  AR 379.  Dr. Goulding, by
contrast, opined that Hagigeorges needed to avoid "concentrated
exposure" to fumes, odors, dusts, gases, and poor ventilation.
AR 302.

    The ALJ found that Hagigeorges needed to avoid exposure to
"excessive" fumes, odors, dusts, gases, or other pulmonary

───────────────

[4]  Dr. Kradin provided a Medical Source Statement which amounted
to an RFC, but he did not begin to treat Hagigeorges until after
the date of last insured and did not purport to direct his Source
Statement to Hagigeorges's condition during the relevant time
period before he began treating her.  *See* AR 375-81.

[5]  Dr. Gibbons later opined that Hagigeorges should avoid "any
inhaled exposures."  AR 679.

irritants.  AR 462.  This finding merits close scrutiny.  While
the ALJ's use of the modifier "excessive" rather than
"concentrated" may be of little consequence,[6] its purported
support comes from Dr. Goulding's non-treating opinion.  RFC
assessments from state agency physicians may be given greater
weight by an ALJ, and may even constitute substantial evidence
supporting an ALJ's determination, but only if their assessments
are consistent with the record as a whole.  *See* Social Security
Ruling 96-6p (noting that an ALJ may give greater weight to a
state-agency physician if his opinion is consistent with and
supported by the record as a whole); *cf. Rodriguez* v. *Sec'y*
*Health & Hum. Servs.*, 647 F.2d 218, 223 (1st Cir. 1981) (holding
that when a state-agency physician's opinion is consistent with
the evidence in the record as a whole, it may constitute the
"substantial evidence" necessary to support an ALJ's findings).

Here, Dr. Goulding's opinion that Hagigeorges should avoid
concentrated exposure to pulmonary irritants is inconsistent with
assessments of other physicians regarding Hagigeorges's
limitations, including the opinion of Dr. Gibbons to which the
ALJ otherwise gave controlling weight.  Dr. Jao, another non-

---

[6]  The terms "excessive" from the ALJ's RFC and "concentrated"
from Dr. Goulding's RFC are essentially synonymous.  One of the
definitions of "excessive" in Webster's Third International
Dictionary is "very large, great, or numerous" or "greater than
usual," Webster's Third International Dictionary 792 (1986),
while the primary definition of "concentrated" is "rich in
respect to a particular or essential element."  *Id.* at 469.

treating physician, thought Hagigeorges should avoid even moderate exposure to pulmonary irritants.  AR 230.  Dr. Gibbons, a physician who treated Hagigeorges after her date of last insured but who reviewed the her records during the relevant time period, agreed with Dr. Jao and thought that Hagigeorges should avoid moderate exposure.  AR 693.  Dr. Kradin, who also treated Hagigeorges only after the relevant time period, said she could never tolerate exposure to pulmonary irritants.  AR 379.

All of these opinions were offered by checking off a box; and I recognize that the "mere checking of boxes denoting levels of residual functional capacity" is accorded "relatively little weight." *Berrios Lopez* v. *Sec'y of Health & Human Services*, 951 F.2d 427, 431 (1st Cir. 1991).  But Dr. Goulding also offered his opinion on this issue by checked box, on a form identical to that used by Dr. Jao.  I also recognize that there are not crisp lines between "excessive," "concentrated," and "moderate" exposure, other than the lines of the boxes being checked.  But, collectively, the opinions of Drs. Gibbons, Jao, and Kradin clearly shade toward a stronger restriction of "zero to moderate" exposure, rather than a recommendation to avoid "concentrated or excessive" exposure.  Dr. Goulding's opinion cannot alone overcome the weight of these other opinions.  *Cf. Ormon* v.

*Astrue*, No. 11-2107, 2012 WL 3871560, at *3 (1st Cir. Sept. 7, 2012).[7]

The ALJ's finding on pulmonary irritants was therefore not supported by substantial evidence in the record.  As a result, the vocational expert's testimony also cannot constitute substantial evidence in support of the ALJ's determination regarding Hagigeorges's ability to perform her past work or make an adjustment to other work.  As recounted above, the VE testified that the hypothetical individual with, among other things, a restriction on "excessive" exposure to pulmonary irritants could perform her past work as a graphic artist.  But, in response to questioning by Hagigeorges's attorney, the VE admitted that if the hypothetical individual could not be exposed to any pulmonary irritants, the hypothetical claimant could not work as a graphic artist or in the other similar jobs the VE had suggested.  Neither the ALJ nor Hagigeorges's attorney inquired about the vocational opportunities available to someone with a restriction somewhere between "excessive" and "nothing at all."

---

[7]  Further confusing the matter is the fact that the ALJ gave "controlling weight" to the opinions of Dr. Kradin and Dr. Gibbons with respect to Hagigeorges's RFC.  The ALJ made no mention of Dr. Goulding's opinion; rather, the government has pointed to Dr. Goulding's opinion to provide post-hoc support, as it is entitled to do.  But the question arises whether that opinion could constitute the substantial evidence supporting the RFC determination when that opinion is inconsistent with evidence that the ALJ himself afforded "controlling weight."

Because the VE's testimony was based on an erroneous hypothetical and did not include a restriction that Hagigeorges should avoid even moderate exposure to pulmonary irritants, the VE's testimony cannot constitute substantial evidence in support of the ALJ's determination at step five. *See Rose* v. *Shalala*, 34 F.3d 13, 19 (1st Cir. 1994) ("Because the ALJ's hypothetical assumed that fatigue did not pose a significant functional limitation for the claimant, and because the medical evidence did not permit that assumption, the ALJ could not rely on the vocational expert's response as a basis for finding claimant not disabled."). On remand, the ALJ should correct his RFC and hold a further hearing, at which he should propose a hypothetical to a VE with the RFC he ultimately finds after further review of the record.

## IV.   CONCLUSION

For the reasons set forth above, I remand the case to the Commissioner for further proceedings consistent with this Memorandum and Order.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE